UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

OCEANA, INC.,

           Plaintiff,

    v.

PENNY PRITZKER,
United States Secretary of Commerce, et al.,[1]

          Defendants,

    and

FISHERIES SURVIVAL FUND

         Defendant-Intervenor.

_____

Civil Action No. 08-1881 (PLF)

OPINION

      This case involves a challenge to a Biological Opinion issued by the National Marine Fisheries Service ("NMFS"), in which NMFS determined that the operation of the Atlantic Sea Scallop Fishery would not jeopardize the continued existence of the Northwest Atlantic population segment of loggerhead sea turtles. This population segment is listed as threatened under the Endangered Species Act ("ESA"). Plaintiff Oceana, Inc. ("Oceana") maintains that the agency's no-jeopardy determination was arbitrary and capricious, and asks this Court to vacate the Biological Opinion. Oceana argues that NMFS reached its no-jeopardy determination by employing an interpretation of a key regulation that contravenes both the

---

[1]    Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes as defendant the current Secretary of Commerce, Penny Pritzker, for former Acting Secretary Rebecca M. Blank.

regulatory text as well as the language and spirit of the underlying statute, the ESA.  In addition, Oceana contends that NMFS neglected in its analysis to take proper account of various factors that harm loggerheads, instead focusing solely on the isolated effects of the Scallop Fishery. Oceana specifically accuses NMFS of ignoring the effects of climate change, an issue which Oceana had raised in comments that it submitted to the agency.  Oceana further argues that NMFS has failed to establish adequate monitoring processes to ensure that limits on the number of loggerheads that lawfully can be harmed are not exceeded by the Fishery's operation.

This matter is before the Court on cross-motions for summary judgment filed by Oceana and NMFS, as well as by defendant-intervenor Fisheries Survival Fund.  The Court heard oral argument on these motions on November 25, 2014.  Upon consideration of the parties' papers, their arguments presented in open court, the relevant legal authorities, and pertinent portions of the administrative record, the Court will grant in part and deny in part each party's motion for summary judgment and it will remand this matter to the agency for a limited purpose.[2]

---

[2]     The papers considered in connection with the pending motions include: Oceana's first amended complaint ("Am. Compl.") [Dkt. No. 80]; the federal defendants' answer [Dkt. No. 82]; Fisheries Survival Fund's answer [Dkt. No. 81]; Oceana's motion for summary judgment ("Oceana MSJ") [Dkt. No. 87]; the federal defendants' combined opposition to Oceana's motion and cross-motion for summary judgment ("NMFS Opp. & MSJ") [Dkt. Nos. 88 and 88-1 (memorandum in support)]; Fisheries Survival Fund's cross-motion for summary judgment ("FSF MSJ") [Dkt. No. 91]; Oceana's combined reply in support of its motion for summary judgment and in opposition to NMFS and FSF motions for summary judgment ("Oceana Reply") [Dkt. No. 93]; the federal defendants' reply in support of their cross-motion for summary judgment ("NMFS Reply") [Dkt. No. 96]; Fisheries Survival Fund's reply in support of its cross-motion for summary judgment ("FSF Reply") [Dkt. No. 97]; Oceana's motion for oral argument [Dkt. No. 101]; the federal defendants' notice of supplemental authority [Dkt. No. 105]; Oceana's motion to strike federal defendants' notice of supplemental authority [Dkt. No. 106]; the federal defendants' opposition to Oceana's motion to strike [Dkt. No. 107]; and the joint appendix of administrative record ("AR") and supplemental administrative record ("SAR") materials.

## I. STATUTORY AND REGULATORY FRAMEWORK

The Endangered Species Act of 1973, as amended, 16 U.S.C. § 1531 et seq., has

been regarded as "the most comprehensive legislation for the preservation of endangered species

ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  The ESA

"seeks to protect species of animals against threats to their continuing existence caused by man."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 558 (1992).  Under the ESA, species may be listed

either as "endangered" or as "threatened."  See 16 U.S.C. § 1533.  An endangered species is "any

species which is in danger of extinction throughout all or a significant portion of its range."

16 U.S.C. § 1532(6).  A threatened species is "any species which is likely to become an

endangered species within the foreseeable future throughout all or a significant portion of its

range."  16 U.S.C. § 1532(20).  The ESA is jointly administered by two federal agencies:  the

Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service.  50 C.F.R.

§ 402.01(b).  FWS administers the statute with respect to species under the jurisdiction of the

Secretary of the Interior, while NMFS covers those species under the jurisdiction of the

Secretary of Commerce.  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644,

651 (2007).

"Section 7 of the ESA prescribes the steps that federal agencies must take to

ensure that their actions do not jeopardize endangered wildlife and flora."  Nat'l Ass'n of Home

Builders v. Defenders of Wildlife, 551 U.S. at 652.  Under Section 7(a)(2), "[e]ach Federal

agency shall, in consultation with and with the assistance of [FWS or NMFS], insure that any

action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

continued existence of any endangered species or threatened species or result in the destruction

or adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2).[3]  Formal

consultation under Section 7 is only required, however, where a federal agency has concluded

after an initial review that its action "may affect listed species or critical habitat."  See 50 C.F.R.

§ 402.14(a).  At the conclusion of the Section 7 consultation process, FWS or NMFS must issue

a Biological Opinion ("BiOp"), "setting forth [its] opinion, and a summary of the information on

which the opinion is based, detailing how the agency action affects the species or its critical

habitat."  16 U.S.C. § 1536(b)(3)(A); see also 50 C.F.R. § 402.14(h).

     When the BiOp concludes that jeopardy is likely to result from the action under

review, the consulting agency "shall suggest those reasonable and prudent alternatives which [it]

believes would not violate [Section 7(a)(2)] and can be taken by [the action agency]."  16 U.S.C.

§ 1536(b)(3)(A); see also 50 C.F.R. § 402.14(h)(3).  "Following the issuance of a 'jeopardy'

opinion, the agency must either terminate the action, implement the proposed alternative, or seek

an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C.

§ 1536(e)."  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. at 652.  Where the

consulting agency concludes that the agency action is not likely to jeopardize the continued

existence of the species but is nonetheless likely to result in some "incidental take," the BiOp

must set forth an Incidental Take Statement ("ITS"), which specifies the permissible "amount or

extent" of this impact on the species.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  "Take" is

defined by the ESA as meaning "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture,

---

[3]     The agency whose action is at issue is known as the "action agency," while either
FWS or NMFS serves as the "consulting agency."  See Nat'l Wildlife Federation v. NMFS, 524
F.3d 917, 924 (9th Cir. 2007).  In this case, NMFS is both the "action agency" and the
"consulting agency."  NMFS' Sustainable Fisheries Division of its Northeast Regional Office
administers the fisheries management program that governs the Atlantic Sea Scallop Fishery,
which makes it the action agency here.  Am. Compl. ¶ 19.  The Protected Resources Division of
the same Regional Office served as the consulting agency and authored the Biological Opinion.
Id. ¶ 18.

or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Although

Section 9 of the ESA prohibits takes of listed species, 16 U.S.C. § 1538(a)(1), incidental takes

are permissible if they occur in accordance with the conditions set forth in an ITS.  50 C.F.R.

§ 402.14(i)(5).  These conditions include "reasonable and prudent measures" that are considered

"necessary or appropriate to minimize" the extent of incidental taking.  50 C.F.R.

§ 402.14(i)(1)(ii).  The action agency is "required" to reinitiate Section 7 consultation

"immediately" if the amount or extent of taking specified in the Incidental Take Statement is

exceeded.  50 C.F.R. §§ 402.14(i)(4), 402.16(a).

In formulating a Biological Opinion, FWS and NMFS must "use the best

scientific and commercial data available."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

A BiOp constitutes final agency action subject to judicial review under the Administrative

Procedure Act.  See Bennett v. Spear, 520 U.S. 154, 177-78 (1997).


## II.  BACKGROUND

Loggerhead sea turtles, or *Caretta caretta*, are the most abundant species of sea

turtle living in United States waters.  SAR 13142.  They are long-lived, and do not reach

reproductive maturity until between ages 32 to 35.  SAR 13157.  Loggerheads feed on mollusks

and crustaceans, among other things.  SAR 13146.  NMFS explains that "[i]n U.S. Atlantic

waters, loggerheads commonly occur throughout the inner continental shelf from Florida to Cape

Cod, Massachusetts and in the Gulf of Mexico from Florida to Texas, although their presence

varies with the seasons due to changes in water temperature."  SAR 13145.  In 1978, loggerheads

were listed under the ESA as threatened throughout their global range.  See SAR 13142.

On September 22, 2011, NMFS and FWS issued a final rule that divided the

worldwide population of loggerheads into nine distinct population segments ("DPSs"), each of

which was separately listed as either endangered or threatened under the ESA.  SAR 13144

(citing 76 Fed. Reg. 58,868 (Sept. 22, 2011)).  This case concerns just one of these distinct

population segments:  the Northwest Atlantic DPS ("NWA DPS"), whose range extends north of

the equator, south of 60° N latitude, and west of 40° W longitude.  See SAR 13144-45.  The

NWA DPS — which, in the proposed version of the rule, originally had been listed as

endangered — ultimately was listed as a threatened species in the final rule.  SAR 13143-44;

see also 76 Fed. Reg. 58,868, 58,917-24, 58,945-46.

      The BiOp under challenge here assesses the impact of the Atlantic Sea Scallop

Fishery on the NWA DPS of loggerheads.  This Fishery's operation is governed by the Scallop

Fishery Management Plan ("Scallop FMP"), pursuant to the Magnuson-Stevens Fishery

Conservation and Management Act ("MSA").  See 16 U.S.C. §§ 1854(a), (b).  The MSA governs

domestic marine fisheries through eight regional fishery management councils that prepare

FMPs.  16 U.S.C. §§ 1801(b)(1)(B), 1852(h).  The Scallop FMP was implemented on May 15,

1982 to manage scallop harvesting.  See SAR 13129.  "Scallops are found in the Northwest

Atlantic Ocean from North Carolina to Newfoundland, along the continental shelf, typically on

sand and gravel bottoms."  SAR 13126.  The Fishery uses dredge and bottom trawl vessels to

capture scallops, operating year-round in U.S. waters.  SAR 13125-26.  The Fishery primarily

uses "dredge gear, a set of steel frames, usually fifteen feet in length, which are towed along the

sea floor," but also uses "[t]rawl gear," comprised of "a cone-shaped net equipped with steel

weights, also towed along the seabed."  Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 213

(D.D.C.), order clarified, 389 F. Supp. 2d 4 (D.D.C. 2005).

      NMFS first initiated formal consultation under Section 7 for the Fishery on

December 21, 2001.  SAR 13121.  This first consultation concluded with the issuance of the

February 2003 BiOp.  As with every BiOp since, NMFS concluded that the Fishery's operation would not jeopardize the continued existence of the loggerhead sea turtle.  Id.  NMFS reinitiated formal consultation later that year, in November 2003, due to the availability of relevant new information.  Id.  The reconsultation resulted in the February 2004 BiOp.  Id.  NMFS again reinitiated consultation in September 2004 to consider yet more new information, resulting in a new BiOP issued in December 2004.  Id.

Plaintiff Oceana, an international advocacy group focused on ocean conservation, brought a lawsuit challenging the December 2004 BiOp, beginning more than ten years of litigation against NMFS' BiOps relating to the Atlantic Sea Scallop Fishery's effect on the loggerhead sea turtle.  Oceana's challenge was unsuccessful, and the December 2004 BiOp was upheld in an opinion by Judge Huvelle.  Oceana v. Evans, 384 F. Supp. 2d 203 (D.D.C.), order clarified, 389 F. Supp. 2d 4 (D.D.C. 2005).

NMFS then reinitiated consultation and issued a new BiOp in September 2006, which Oceana also challenged in court.  See Oceana, Inc. v. Gutierrez, Civil Action No. 1:07-cv-00142-RBW (D.D.C. filed Jan. 19, 2007).  After the litigation was underway, however, in April 2007 NMFS yet again reinitiated consultation.  See Notice re: Biological Opinion, Oceana v. Gutierrez, No. 1:07-cv-00142-RBW (May 4, 2007) [Dkt. No. 14].  Because consultation was continuing, the parties agreed to stay the litigation.  Motion to Approve Joint Stipulation & Order, Oceana v. Gutierrez, No. 1:07-cv-00142-RBW (June 29, 2007) [Dkt. No. 21].  The parties then voluntarily dismissed the case after entering into a Joint Stipulation, whereby NMFS agreed to consider Oceana's comments in developing the new BiOp.  See Joint Stipulation & Order, Oceana v. Gutierrez, No. 1:07-cv-00142-RBW (Jan. 23, 2008) [Dkt. No. 25].

In March 2008, NMFS issued a superseding BiOp ("the 2008 BiOp") (later amended on February 5, 2009).  SAR 13120.  Oceana then initiated the present action challenging the 2008 BiOp, filing its complaint on October 31, 2008.  See Dkt. No. 1.  In February 2012, NMFS reinitiated consultation once again, and the following month it filed a motion seeking a stay of proceedings with respect to Oceana's challenge to the 2008 BiOp.  See Dkt. No. 70.  Over Oceana's objection, the Court granted NMFS' motion, see Dkt. No. 73, and this action was stayed.  NMFS issued the superseding BiOp on July 12, 2012, and the stay was lifted on October 31 of that year.  In the 2012 BiOp, NMFS estimated that the Scallop Fishery would result in a total of 301 loggerhead takes annually.  SAR 13245-48.  Of those takes, NMFS predicted that during the 2012 fishing year up to 195 would be fatal, and that in subsequent years only up to 112 would be fatal due to the implementation of technological improvements designed to protect loggerheads.  SAR 13263.  The 2012 BiOp concluded that notwithstanding this loss of life, the continued operation of the Scallop Fishery would not be likely to result in jeopardy to the NWA DPS of loggerheads.  Following Oceana's filing of an Amended Complaint challenging this updated BiOp, the parties filed the three pending cross-motions for summary judgment.

## III.  LEGAL STANDARD

"[W]hen an agency action is challenged[, t]he entire case on review is a question of law, and only a question of law."  Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  While the general standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure does not apply to a review of agency action, summary judgment nonetheless "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA

standard of review." Sierra Club v. Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing

Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)); accord Cottage Health Sys. v.

Sebelius, 631 F. Supp. 2d 80, 89-90 (D.D.C. 2009).

   Under the APA, a reviewing court shall "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The arbitrary and capricious

standard is deferential; it requires that agency action simply be 'reasonable and reasonably

explained.'"  Communities for a Better Environment v. EPA, 748 F.3d 333, 335 (D.C. Cir. 2014)

(quoting Nat'l Telephone Cooperative Ass'n v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009)); see

also Kennecott Greens Creek Min. Co. v. Mine Safety and Health Admin., 476 F.3d 946, 954

(D.C. Cir. 2007) ("[The] standard of review under the arbitrary and capricious test is only

reasonableness, not perfection.").  "An agency action will be upheld if the agency 'articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made.'"  FirstEnergy Serv. Co. v. FERC, 758 F.3d 346, 352 (D.C. Cir. 2014) (quoting

Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,

463 U.S. 29, 43 (1983)) (internal quotation marks omitted).  Furthermore, a court will "give an

extreme degree of deference to the agency when it is evaluating scientific data within its

technical expertise."  Communities for a Better Environment v. EPA, 748 F.3d at 336 (quoting

City of Waukesha v. EPA, 320 F.3d 228, 247 (D.C. Cir. 2003)) (internal quotation marks

omitted); see also Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C. Cir. 1997) (a federal court

should "review scientific judgments of the agency 'not as the chemist, biologist, or statistician

that we are qualified neither by training nor experience to be, but as a reviewing court exercising

our narrowly defined duty of holding agencies to certain minimal standards of rationality'")

(quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc)).

"The Court's review, however, must be 'searching and careful.'" Colorado River

Cutthroat Trout v. Salazar, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting Nat'l Envtl. Dev.

Assn's Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012)).  "An agency decision is

arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise.'" Cablevision Sys. Corp.

v. FCC, 649 F.3d 695, 714 (D.C. Cir. 2011) (quoting Motor Vehicle Mfrs. Ass'n of United

States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43); accord Agape Church, Inc. v.

FCC, 738 F.3d 397, 410 (D.C. Cir. 2013).  Just as the Court may not "substitute [its] judgment

for that of the agency" to set aside an agency action, Rural Cellular Ass'n v. FCC, 588 F.3d

1095, 1105 (D.C. Cir. 2009), it also may not "affirm an agency decision on a ground other than

that relied upon by the agency."  Manin v. Nat'l Transp. Safety Bd., 627 F.3d 1239, 1243 (D.C.

Cir. 2011).

## IV.  DISCUSSION

### A.  Article III Standing

NMFS first asserts that Oceana lacks standing to challenge the 2012 BiOp.

Although Oceana has proffered the declarations of two of its members — who maintain that they

enjoy the study and observation of loggerheads and therefore would be injured by harm to the

species caused by interactions with the Scallop Fishery — NMFS contends that because the

"action area" does not extend to the specific North Carolinian island on which those declarants

observe sea turtles, they cannot demonstrate a causal connection between the Fishery and their asserted injuries.  See NMFS Opp. & MSJ at 19-20; NMFS Reply at 2-3.[4]

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'"  Massachusetts v. EPA, 549 U.S. 497, 516 (2007).  The requirement of standing flows from this limitation.  Lujan v. Defenders of Wildlife, 504 U.S. at 560.  Standing doctrine assures that "the litigant is entitled to have the court decide the merits of the dispute or of particular issues," Warth v. Seldin, 422 U.S. 490, 498 (1975), by demanding that he or she "possess a 'direct stake in the outcome' of the case."  Hollingsworth v. Perry, 133 S. Ct. 2652, 2662 (2013) (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 64 (1997)).

To possess standing, a plaintiff must have suffered an "injury in fact," meaning "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Lujan v. Defenders of Wildlife, 504 U.S. at 560 (internal citations and quotation marks omitted).  In addition, "there must be a causal connection between the injury and the conduct complained of . . . [and] it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Id. at 560-61 (internal citations and quotation marks omitted).  An organizational plaintiff, such as Oceana, "may have standing to sue on its own behalf 'to vindicate whatever rights and immunities the association itself may enjoy' or, under proper conditions, to sue on behalf of its members asserting the members' individual rights."  Common Cause v. Fed. Election Comm'n, 108 F.3d 413, 417 (D.C. Cir. 1997) (quoting Warth v. Seldin, 422 U.S. at 511).[5]  When "an organization

---

[4]     The 2012 BiOp defines the action area as "the area to be directly and indirectly affected by the scallop fishery," which is "the area in which the scallop fishery operates."  SAR 13137.

[5]     Oceana asserts each of these forms of standing — "organizational" and "representational" — both of which are contested by NMFS.  Because the Court concludes that

sues on behalf of its members, the organization must demonstrate '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Id. (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)).

Oceana's two declarants — Erica Grantmyre and Emily Fisher — observe and study loggerheads on Bald Head Island, which lies off the coast of North Carolina.[6]  Ms. Grantmyre lives on Bald Head Island and volunteers with the Bald Head Island Conservancy. Declaration of Erica Grantmyre ("Grantmyre Decl.") ¶¶ 2-3 [Dkt. No. 93-1].  While volunteering, she monitors and excavates loggerhead nests. Id. ¶¶ 4-6.  Ms. Grantmyre states that she would be "injured," "devastated," and "upset," if she "were unable to monitor or excavate nests on Bald Head Island because loggerhead sea turtles had gone extinct or their populations were so depleted that they would not return to the island," as well as if members of the public such as her own grandchildren were "unable to observe the nests and baby turtles as a result of depletion in the turtles' population." Id. ¶¶ 11, 13.  She notes that she already has observed "females arriving to nest whose carapaces are severely dented," and opines that "[i]t appears that these injuries have occurred from boat propellers or other heavy equipment."

---

Oceana has standing to challenge the BiOp on behalf of two of its members, it does not reach the question whether Oceana would have standing to pursue this action on its own behalf.

[6]    NMFS initially argues that because Oceana's declarations "were executed in 2010, [they] thus fail to provide any evidence of the declarants' present or planned future use of areas frequented by sea turtles."  NMFS Opp. & MSJ at 19.  In response to this argument, Oceana has submitted new declarations virtually identical to the earlier ones — executed and updated by the declarants in 2013 — along with its reply brief.  See Oceana Reply at 2-3 n.2; see also NMFS Reply 2 n.3 (acknowledging Oceana's submission of updated declarations).  The Court refers to the versions of these declarations that were executed in 2013.

Id. ¶ 10.  Similarly, Ms. Fisher's family owns a home on Bald Head Island that she plans to

continue visiting "on a yearly basis," where she "derive[s] great pleasure from observing the

nesting and hatching of loggerhead turtles and from witnessing them interact with their natural

environment."  Declaration of Emily Fisher ("Fisher Decl.") ¶ 12 [Dkt. No. 93-2].  Ms. Fisher

states that she would be "devastated" if she were "unable to witness a mature loggerhead turtle

nesting or a nest hatching because the sea turtles had gone extinct or their population was so

depleted that they would not return to the island."  Id. ¶ 13.

      These declarations from two of Oceana's members are sufficient to ground

Oceana's standing to challenge the 2012 BiOp.  See In re Navy Chaplaincy, 697 F.3d 1171, 1178

(D.C. Cir. 2012).  "The Supreme Court has repeatedly made clear that injury to an aesthetic

interest in the observation of animals is sufficient to satisfy the demands of Article III standing."

Animal Legal Defense Fund, Inc. v. Glickman, 154 F.3d 426, 432 (D.C. Cir. 1998) (en banc).

Oceana's declarants claim injury to this interest, and they allege a "fairly traceable" connection

between their injury and the Scallop Fishery's operation — a connection that is supported by the

administrative record.  It is undisputed that the operation of the Atlantic Sea Scallop Fishery

leads to the deaths of loggerhead sea turtles within the NWA DPS, and that those loggerheads

nesting on Bald Head Island are members of this specific population of turtles.  See, e.g., SAR

13145-46, 13149-50, 13267-68.  Consequently, loggerhead takes resulting from the BiOp's

alleged infirmities could lead directly to the injuries asserted by Ms. Grantmyre and Ms. Fisher.

And, for this reason, Oceana's challenge to the BiOp's adequacy could, if successful, redress

these injuries.

      NMFS argues that Oceana relies on the "animal nexus" theory of standing that

was rejected by the Supreme Court in Lujan, but this argument is unpersuasive.  The Lujan Court

characterized this discredited approach as maintaining that "anyone who observes or works with an endangered [or threatened] species, *anywhere in the world*, is appreciably harmed by a single project affecting *some portion* of that species with which he has no more specific connection." Lujan v. Defenders of Wildlife, 504 U.S. at 567 (emphases added).  Here, by contrast, Ms. Grantmyre and Ms. Fisher state that they study and observe loggerheads who belong to the specific population segment that is adversely affected by the Atlantic Sea Scallop Fishery.  This is sufficient to support standing.  See Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 230 n.4 (1986) (whale conservation groups had standing because "the whale watching and studying of their members will be adversely affected by continued whale harvesting"); Defenders of Wildlife v. Gutierrez, 532 F.3d 913, 923-25 (D.C. Cir. 2008) (plaintiffs, having proffered declarations from individuals who "engage in whale watching and the studying of whales," had standing to challenge agency actions concerning the protection of right whales from mortalities caused by ship strikes) (citing Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. at 230 n.4).

         The Court also rejects NMFS' related assertion that "Oceana errs in focusing on the range of the species rather than the action area defined in the 2012 BiOp."  NMFS Reply at 3 & n.4; see also NMFS Opp. & MSJ at 19-20.  As Oceana's counsel demonstrated at oral argument, Bald Head Island lies a mere 100 miles south of the lower boundary of the Fishery.  Loggerheads that nest on Bald Head, therefore, quickly enter the Fishery upon leaving their nesting sites and spend much of the year traversing the Fishery before eventually returning to their nests the following year.  And as Oceana persuasively explains, "[i]f a turtle is killed off the coast of Long Island on its way to its nesting beach in North Carolina, a resident of North Carolina would plainly suffer an injury when the turtle does not appear at its normal nesting

site."  Oceana Reply at 5.  NMFS' decision to circumscribe the scope of the action area, for

purposes of its Section 7 consultation, to the area in which the Scallop Fishery operates has no

bearing on the constitutional principles of injury in fact, causation, and redressability that govern

this Court's standing inquiry.  Moreover, NMFS fails to acknowledge that the relevant injury

here is not injury to loggerheads, but, rather, injury to the plaintiffs' members.  For the reasons

just explained, Ms. Grantmyre and Ms. Fisher each would have standing to challenge the 2012

BiOp.

   Oceana must also show that the interests it seeks to protect by this lawsuit are

germane to its organizational purpose, and that "neither the claim asserted nor the relief

requested requires the participation" of Ms. Grantmyre or Ms. Fisher as individuals.  See Hunt v.

Wash. State Apple Adver. Comm'n, 432 U.S. at 343.  These two elements are easily satisfied.

The protection of marine life is central to the organization's purpose, and the litigation of this

challenge to the 2012 BiOp does not require the participation of Oceana's individual members,

nor would the relief requested implicate Ms. Grantmyre or Ms. Fisher individually.  The Court

therefore concludes that Oceana has Article III standing to pursue this action.

   *B.  Is NMFS' Interpretation of 50 C.F.R. § 402.02 Arbitrary and Capricious?*

   Oceana's principal argument is that NMFS, in determining whether the Scallop

Fishery would "jeopardize the continued existence of" loggerheads within the NWA DPS, see 16

U.S.C. § 1536(a)(2), applied an unlawful construction of the regulation that defines this pivotal

statutory phrase.  The regulation at issue provides that the statutory phrase "[j]eopardize the

continued existence of" means

    to engage in an action that reasonably would be expected, directly
    or  indirectly,  to  reduce  appreciably  the  likelihood  of  both  the

survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

50 C.F.R. § 402.02.  In the 2008 BiOp, NMFS indicated that it construed the term "reduce appreciably" to mean that there be a "*considerable* or *material* reduction in the likelihood of survival and recovery" of the species.  See AR 16839-40 (emphases added).  Although the 2012 BiOp pointedly declines to restate this definition, see SAR 13116, Oceana contends that NMFS has again required a "considerable" or "material" reduction in the likelihood of loggerheads' survival and recovery.  It argues that such construction of the regulation contravenes the plain text of the regulation as well as the language and purpose of the Endangered Species Act itself, resulting in an erroneous determination that the Fishery is not likely to jeopardize the continued existence of the NWA DPS of loggerheads.

Although the 2012 BiOp does not explicitly define "reduce appreciably," Oceana infers that NMFS' analysis in the 2012 BiOp employed the same standard as it had applied in the 2008 BiOp, where NMFS did define the regulatory language as requiring a "considerable" or "material" reduction in order to trigger a finding of jeopardy.  See Oceana MSJ at 1-2, 17-18 & n.13; Oceana Reply at 6-7.  NMFS appears to concede that Oceana's inference is accurate.  See NMFS Opp. & MSJ at 25-26 ("NMFS does not dispute that the underlying approach to the jeopardy analysis in the 2012 BiOp was largely the same as that in the 2008 BiOp."); id. at 26 ("In both [BiOps], the agency considered the impact of takes from the fishery on the future survival and recovery of the species, and whether any difference was both capable of being considered *and meaningful from a biological perspective*.") (emphasis added).  Thus, despite NMFS' decision not to define "reduce appreciably" in the 2012 BiOp, the parties seem to agree that NMFS applied a construction of the phrase that aligns with the definition that it articulated in the 2008 BiOp.  Accordingly, contrary to the suggestion of intervenor-defendant Fisheries

Survival Fund, see FSF MSJ at 24 n.17; FSF Reply at 4, Oceana's challenge to the propriety of this construction of the regulation is not moot.[7]

### 1.   Consistency with Regulatory Text

Oceana argues that the language of 50 C.F.R. § 402.02 is unambiguous and that NMFS' interpretation of its key phrase — "reduce appreciably" — is plainly inconsistent with the regulatory text.  According to Oceana, the word "appreciably" means "'capable of being perceived' or measured."  Oceana MSJ at 24 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 105 (1993)).  Thus, says Oceana, NMFS has unlawfully imported a heightened requirement that any reduction in the likelihood of loggerheads' survival and recovery be "considerable" or "material," rather than simply being perceptible.  Id. at 24-26; Oceana Reply at 9-10.  And Oceana contends that if the regulation's text is construed according to its ordinary meaning, "there can be no question that . . . the Fishery will cause an 'appreciable' reduction in Loggerheads," given the evidence in the administrative record.  Oceana MSJ at 25; see also id. at 17 (stating that NMFS applied "the same definition in 2012 that it had invented in 2008; otherwise, it could not have found that the Fishery would not" cause jeopardy); Oceana Reply at 12-13.  NMFS and FSF both maintain that the agency's interpretation of its own regulation is consonant with the regulatory text, and that its interpretation therefore is entitled to deference

---

[7]      By contrast, the Court does find moot Oceana's requests for relief that relate specifically to the 2008 BiOp.  See Am. Compl., Prayer for Relief ¶¶ (1), (5).  The 2008 BiOp is no longer in force, having been superseded by the 2012 BiOp.  NMFS Opp. & MSJ at 21-22; see American Rivers v. Nat'l Marine Fisheries Serv., 126 F.3d 1118, 1123-24 (9th Cir. 1997) (new BiOp generally renders moot any challenges to the validity of its predecessor).

from this Court.  NMFS Opp. & MSJ at 29-31; NMFS Reply at 6-8; FSF MSJ at 25-31; FSF Reply at 7-9.[8]

"An agency's interpretation of its own regulations is entitled to 'substantial deference' and is given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Shieldalloy Metallurgical Corp. v. Nuclear Regulatory Comm'n, 768 F.3d 1205, 1208 (D.C. Cir. 2014) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)); see Auer v. Robbins, 519 U.S. 452 (1997); see also Christensen v. Harris County, 529 U.S. 576, 588 (2000) (Auer deference warranted only where regulation is ambiguous).  A federal court will temper this measure of deference, however, where the agency's interpretation of its own ambiguous regulation "conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position, or a post hoc rationalizatio[n] advanced by an agency seeking to defend past agency action against attack." Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166-67 (2012) (citations and internal quotation marks omitted) (alteration in original).  Where a court finds reason not to afford the normally strong degree of deference to an agency's regulatory interpretation, it "instead accord[s] the [agency's] interpretation a measure of deference proportional to the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" Id. at 2168-69 (quoting United States v. Mead Corp., 533 U.S. 218, 228 (2001)) (internal quotation marks omitted).

---

[8]    NMFS also contends that the Court need not reach this question at all, given evidence in the administrative record that, according to NMFS, demonstrates the correctness of its no-jeopardy determination even under Oceana's preferred construction of the regulation.  See NMFS Opp. & MSJ at 26-29; NMFS Reply at 5-6.  The Court is not persuaded that the record is so unequivocal on this point that it obviates the need to resolve the parties' dispute over NMFS' regulatory interpretation.

The Court concludes that NMFS' construction of the phrase "reduce appreciably" does not contravene the text of 50 C.F.R. § 402.02, which, contrary to Oceana's contention, is far from unambiguous.  As noted, Oceana relies on *Webster's* for the "common dictionary definition" of "appreciable" as meaning "capable of being perceived or measured."  Oceana MSJ at 15, 24.[9]  But as NMFS points out, see NMFS Reply at 7 n.10, this is not the only available definition of the word.  See THE NEW OXFORD AMERICAN DICTIONARY 1724 (2d ed. 2005) ("Something that is appreciable is large enough to be measured, valued, estimated, *or considered significant*.") (emphasis added) (boldface type omitted); cf. United States v. Wells, 706 F.3d 908, 915 (8th Cir. 2013) (referring to "the purchase of an appreciable amount of pills"); Savin Corp. v. Savin Group, 391 F.3d 439, 456 (2d Cir. 2004) (test for trademark infringement asks whether an "appreciable number of ordinarily prudent purchasers" are likely to be misled or confused); Scott v. Hubert, Civil Action No. 08-11-FJP-SCR, 2012 WL 3016244, at *4 (M.D. La. May 14, 2012) (referring to "appreciable time in prison").  NMFS therefore is within the bounds of its discretion to construe the word "appreciably" as entailing more than a bare reduction in the likelihood of loggerheads' survival and recovery to result in a finding of jeopardy.  Rather, the agency construes its regulation to afford its scientists the discretion to determine whether a given reduction in those likelihoods is "meaningful from a biological perspective."  NMFS Opp. & MSJ at 26.  This construction is neither plainly erroneous nor inconsistent with the regulatory text, which, instead of commanding only one interpretation, is ambiguous.

Although an agency's interpretation of an ambiguous regulation generally receives substantial deference, Oceana contends that NMFS' interpretation of "reduce appreciably" does not merit such deference because it conflicts with a prior interpretation

---

[9]      Appreciably, as the adverbial form of appreciable, generally does not enjoy its own dictionary entry.  Accordingly, Oceana cites the definition for the adjective, not the adverb.

employed by the agency.  Specifically, Oceana points to materials created by the Fish and

Wildlife Service and used by NMFS to train its Section 7 biologists, in which "appreciable" is

defined to mean "capable of being perceived," and "[m]easureable, detectable, perceptible."

Oceana MSJ at 25.  NMFS responds by noting that its preferred interpretation of "appreciably" is

consistent with the interpretation given by FWS and NMFS to a related regulation under the

ESA, an interpretation that is set forth in the agencies' shared *Endangered Species Consultation*

*Handbook*.  See NMFS Opp. & MSJ at 30 n.9; NMFS Reply at 8 n.11 (noting that the agencies

interpret "appreciably diminish the value of" critical habitat as "to considerably reduce the

capability" of the habitat to support the species).  NMFS also contends that even if its definition

of "appreciably" is viewed as a departure from the interpretation provided in the FWS training

materials, the explanation provided in the 2008 BiOp "reasonably explained that departure."

NMFS Opp. & MSJ at 30 n.9.

      The Court need not resolve this conflict regarding the applicability of Auer

deference in these circumstances, because even under a less deferential standard, see Christopher

v. SmithKline Beecham Corp., 132 S. Ct. at 2168-69, NMFS has the more sound reading of the

regulation.  Oceana insists that an "appreciable" reduction means any "perceptible" reduction in

the likelihood of loggerheads' survival and recovery.  But this approach saps any function from

the word "appreciable," which modifies the verb "reduce."  An imperceptible reduction in the

likelihood of loggerheads' survival and recovery would be invisible, and thus indistinguishable

from a finding of no reduction at all.  It is a basic rule of textual construction that each word

should be given meaning.  See Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S.

at 668-69 (applying canon against surplusage in interpretation of regulation).  The Court

therefore agrees with NMFS that its construction of "appreciably" is more in accord with the text

of the regulation than is the approach advocated by Oceana.  See NMFS Reply at 7-8.  And this

conclusion is in line with the reading given to this language by the Ninth Circuit, which has

recognized that the word appreciable, as employed in 50 C.F.R. § 402.02, implicates some

measure of the *extent* of a reduction in species' likelihood of survival and recovery.  See Wild

Fish Conservancy v. Salazar, 628 F.3d 513, 523 (9th Cir. 2010) ("There could be *some* impact,

but not an *appreciable* impact, in each of several subdivided periods of operation that, in

cumulation, have an undeniably appreciable impact.") (emphases added); cf. In re Consolidated

Salmonid Cases, 791 F. Supp. 2d 802, 872-73 (E.D. Cal. 2011) (inquiry under related provision

of ESA is whether record demonstrates that agency action "will have a significant (i.e.,

appreciable or considerable) impact on the critical habitat" of listed species).

   Finally, Oceana argues that NMFS' interpretation of "reduce appreciably" leads

the agency to ignore the Fishery's effects on the loggerhead's likelihood of recovery from its

threatened status — as opposed merely to its survival — in contravention of the regulation's

mandate to consider both survival and recovery.  "Recovery means improvement in the status of

listed species to the point at which listing is no longer appropriate under the criteria set out in

[the ESA]." 50 C.F.R. § 402.02.  Oceana emphasizes that the plain language of the controlling

regulation requires NMFS to assess whether the Fishery's operation "reasonably would be

expected . . . to reduce appreciably the likelihood of *both* the survival *and recovery*" of

loggerheads in the NWA DPS.  50 C.F.R. § 402.02 (emphases added).  According to Oceana, "in

considering the effect of the Fishery based on a 'material or considerable' reduction in chances

of survival using tests of 'statistical significance,' the Fisheries Service ignored the impact of the

Fishery on Loggerheads' recovery."  Oceana MSJ at 27; see also Oceana Reply at 16 ("The

Fisheries Service's interpretation does not even require it to consider recovery impacts . . . .").

The Court agrees with Oceana that the agency must address both the survival and recovery prospects of the loggerhead.  But its argument based on that premise extends no further than the conclusory statements that the Court has quoted above; if there is some logic to its contention that NMFS' construction of "reduce appreciably" necessarily reads "recovery" out of the regulation, Oceana does not elucidate that linkage.

Nor is the Court persuaded by Oceana's related contention, advanced in its reply brief, that the agency's analysis of the Fishery's effect on loggerheads' recovery prospects is "perfunctory," and, in effect, no different than its analysis of the Fishery's effects on survival.  See Oceana Reply at 9-10.  The BiOp includes a fairly extensive discussion of recovery impacts, centered on the recovery criteria established in the 2008 Recovery Plan for the Northwest Atlantic Population of the Loggerhead Sea Turtle.  See SAR 13148-49, 13265-68.  NMFS specifically finds in the BiOp that interactions between loggerheads and the Fishery will not lessen the species' genetic heterogeneity, see SAR 13268, and it further determines that the continued operation of the Fishery will not affect two of the loggerheads' recovery criteria — the number of nests and nesting females, and trends in abundance on foraging grounds — to such an extent that there would be an appreciable reduction in their likelihood of recovery.  SAR 13270.  NMFS concludes that the "proposed action would not impede progress on carrying out any aspect of the recovery program or achieving the overall recovery strategy."  Id.  Thus, NMFS has identified the reasons underlying its conclusion that the likelihood of loggerheads' recovery would not be appreciably reduced by the operation of the Fishery, and it has articulated a rational connection between these reasons and that conclusion.  This is all that the APA requires.[10]

---

[10]     Oceana puts forth an additional argument that appears principally in its reply brief, contending that the agency's use of statistical significance tests — by way of its reliance on a technical paper, the Population Viability Analysis — "elevates statistical certainty above the obligation to protect Loggerheads from actions that *reasonably can be expected* to reduce their

2.  Consistency with the Endangered Species Act

Oceana contends that even "if [NMFS] correctly construed its regulation, then it impermissibly construed the Endangered Species Act because [NMFS'] interpretation inverts its conservation mandate under that statute, conflicting with its text, structure, and purpose." Oceana MSJ at 23; see Stinson v. United States, 508 U.S. 36, 47 (1993) (interpretation of regulation may not "run afoul of the Constitution or a federal statute").  Oceana first suggests that the ESA's mandate — requiring federal agencies to "insure that any action authorized, funded, or carried out by [the agency] . . . is not likely to jeopardize the continued existence of any [listed species]" — means that NMFS must conclude that jeopardy is likely where the action under review causes any perceptible reduction in the likelihood of a species' survival and recovery.  It therefore argues that NMFS' interpretation of "reduce appreciably" — which reaches only "considerable" or "material" reductions — is out of step with the plain language of Section 7 of the statute.  Oceana MSJ at 28.  More specifically, Oceana maintains that for an agency action to "jeopardize the continued existence of" a listed species, that action must only cause "some deterioration in the species' pre-action condition."  Id. (quoting Nat'l Wildlife Federation v. NMFS, 524 F.3d 917, 930 (9th Cir. 2007)) (internal quotation marks omitted).

Oceana's only support for this textual argument is the Ninth Circuit's decision in Nat'l Wildlife Federation v. NMFS.  But Oceana has presented the language of that opinion out of context.  The Ninth Circuit there was explaining that the word "jeopardize" indicates an element of causation, meaning that even if "background conditions [already have] place[d] a species in jeopardy," the agency action under review "can only 'jeopardize' a species' existence if that agency action causes some deterioration in the species' pre-action condition."  Nat'l

likelihood of survival and recovery."  Oceana Reply at 11 (emphasis added) (paraphrasing 50 C.F.R. § 402.02).  The Court is unpersuaded that the regulatory language requires NMFS to forego use of this common statistical tool.

23

Wildlife Federation v. NMFS, 524 F.3d at 930 (emphasis added).  The Ninth Circuit was not

addressing the issue presented here, namely whether NMFS may consider the *extent* of any such

deterioration as a factor in determining whether the action is likely to jeopardize the species'

continued existence.  Thus, the Court does not agree with Oceana's suggestion that the ESA's

plain language is unambiguous — equating "jeopardize the continued existence" with any degree

of reduction in the likelihood of a species' survival and recovery.  To the contrary, the statutory

text simply does not speak directly to the question of how jeopardy to a species' continued

existence is to be assessed.

Oceana further argues that NMFS' approach contravenes the design and purpose

of the ESA.  Oceana MSJ at 28-30; Oceana Reply at 14-16.  The Supreme Court has emphasized

that the statute's "language, history, and structure . . . indicates beyond doubt that Congress

intended endangered species to be afforded the highest of priorities."  Tenn. Valley Auth. v. Hill,

437 U.S. at 174.  According to Oceana, NMFS' interpretation of 50 C.F.R. § 402.02 "gives 'the

benefit of the doubt' to the action, *not* the species."  Oceana MSJ at 30 (quoting language that

originated in a House Conference Report).  Such an approach, says Oceana, "would permit

Loggerheads to be 'gradually destroyed, so long as each step on the path to destruction is

sufficiently modest.'"  Id. (quoting Nat'l Wildlife Federation v. NMFS, 524 F.3d at 930).  In

essence, it seems, Oceana maintains that because Congress intended the ESA to weigh heavily in

favor of species' protection — and as NMFS' interpretation of "reduce appreciably" could lead

to more harm to a species than would Oceana's approach — NMFS' construction of the

regulation must contravene the statute.

But just because Oceana's approach may be more protective than the agency's

does not mean that NMFS' interpretation of 50 C.F.R. § 402.02 — and, in turn, its construction

of "jeopardize the continued existence of" — is in conflict with the Endangered Species Act.

NMFS, as an expert agency charged with administering the ESA, may reasonably conclude that a

given agency action, although likely to reduce the likelihood of a species' survival and recovery

to some degree, would not be likely to jeopardize the continued existence of the species.  Of

course, this does not mean that NMFS has unfettered discretion to permit *any* degree of reduction

in the likelihood of a species' survival and recovery.  In a given case, NMFS' determination that

a particular reduction is not "material" may be unreasonable in light of the data on which the

agency relied, and therefore arbitrary and capricious.  See Motor Vehicle Mfrs. Ass'n of United

States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43.  The Court cannot say, however,

that NMFS' reading of "jeopardize the continued existence of" is inconsistent with the ESA.

The statute does not define how the concept is to be measured, and the agency therefore has

discretion to make this determination on the basis of its own expertise.

### C.  Is the 2012 BiOp's No-Jeopardy Determination Arbitrary and Capricious for Other Reasons?

Apart from Oceana's focus on NMFS' interpretation of the words "reduce

appreciably," Oceana levels other attacks against the agency's no-jeopardy determination.  The

Court first considers Oceana's contention that NMFS did not adequately account for so-called

"cumulative effects" and "aggregate effects" in conducting its jeopardy analysis.  Next, the Court

examines Oceana's argument that NMFS specifically failed to consider the potential effects of

climate change.  This latter argument is made in the context of a broader claim relating to

Oceana's submission of comments to NMFS, which, Oceana says, the agency ignored.  Oceana's

comments were offered during the Section 7 consultation that led to issuance of the 2008 BiOp,

pursuant to a stipulation between the parties in the civil action involving Oceana's challenge to

the 2006 BiOp.  In its comments, Oceana highlighted the potential effects of climate change on loggerheads' survival and recovery.  According to Oceana, NMFS' failure to incorporate serious consideration of climate change in the 2012 BiOp constitutes a violation of the stipulation, as well as a violation of the agency's statutory duty to "use the best scientific and commercial data available" in formulating the BiOp.  See 16 U.S.C. § 1536(a)(2).

1.  Cumulative Effects and Aggregate Effects

Oceana maintains that the BiOp is arbitrary, capricious, and contrary to law because it fails to take account of so-called (1) "cumulative effects" and (2) "aggregate affects."

The term "cumulative effects" is defined in the regulations as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  50 C.F.R. § 402.02.  In formulating its Biological Opinion, NMFS is obligated to determine "whether the action, *taken together with cumulative effects*, is likely to jeopardize the continued existence of listed species."  50 C.F.R. § 402.14(g)(4) (emphasis added).  Oceana contends that NMFS ignored these effects in performing its jeopardy analysis.  See Oceana MSJ at 30-31.

The term "aggregate effects" is not found in the regulations.  Oceana draws the term from the *Endangered Species Consultation Handbook* ("Handbook"), which NMFS and FWS both use to guide their performance of Section 7 consultations under the ESA.  The Handbook states that a jeopardy determination is reached by assessing "whether the aggregate effects of the factors analyzed under [1] 'environmental baseline,' [2] 'effects of the action,' and [3] 'cumulative effects' in the action area — when viewed against the status of the species . . . — are likely to jeopardize the continued existence of the species."  Id. (quoting Handbook at 4-33

(AR 2,277)).[11]  Oceana employs the term "aggregate effects" in two ways.  First, Oceana uses

the term "aggregate effects" to refer specifically to the impact of more than 600 loggerhead takes

that NMFS has authorized to occur in other federally regulated fisheries — besides the Scallop

Fishery — which, says Oceana, the agency failed to consider in reaching its no-jeopardy

determination in the 2012 BiOp.[12]  Second, Oceana invokes the concept of "aggregate effects" to

advance a broader methodological point, arguing that NMFS evaluated the Scallop Fishery's

effects in isolation, rather than in conjunction with the other factors identified in the regulations

as contributors to jeopardy.  See Oceana MSJ at 30-31.  Thus, claims Oceana, no matter how dire

the straits faced by the loggerhead due to the myriad factors that harm the species, NMFS will

conclude that the Scallop Fishery does not cause jeopardy so long as the number of takes caused

by the Scallop Fishery *alone* are not "too much."  See id. (quoting SAR 13264).

      NMFS maintains that it did account for the cumulative effects of future state and

private actions that affect loggerheads, as well as for the impact of the more than 600 loggerhead

---

[11]      The regulation provides:  "*Effects of the action* refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline.  The *environmental baseline* includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.  *Indirect effects* are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur.  *Interrelated actions* are those that are part of a larger action and depend on the larger action for their justification.  *Interdependent actions* are those that have no independent utility apart from the action under consideration."  50 C.F.R. § 402.02 (emphases added).

[12]      These takes fall within the scope of the "environmental baseline," which, as noted supra note 11, "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  See 50 C.F.R. § 402.02.

takes caused by other federally authorized fisheries.  See NMFS Opp. & MSJ at 31-34; NMFS

Reply at 11-12.  NMFS also disputes Oceana's contention that the agency erroneously evaluated

the Scallop Fishery's impact on loggerheads in isolation, rather than in conjunction with the

effects of the other factors identified in the regulations as contributors to jeopardy.  NMFS

maintains that its analysis of whether the effects of Scallop Fishery takes on loggerheads'

survival and recovery are "too much" occurs "in the context of" those other factors enumerated

in the regulations, including cumulative effects and the effects of takes caused by other federally

authorized fisheries.  See NMFS Opp. & MSJ at 32-34; NMFS Reply at 11-12.

        To support these assertions, NMFS points to various sections of the 2012 BiOp

that set forth narrative discussions of the factors that Oceana has accused it of failing to consider.

With respect to cumulative effects, Section 7 of the BiOp — entitled Cumulative Effects —

identifies several future private and state activities affecting loggerheads, including fishing

activities in state waters; the travels of seagoing vessels, which can collide with sea turtles; and

human-caused pollution and contamination of the environment.  See SAR 13259-61.  NMFS

states, however, that it lacks quantitative information regarding how many loggerheads might be

negatively affected by these factors and therefore assumes them to be consistent with previous

trends.  Id.  And with respect to the effects of other federally authorized fisheries, in Section 4 of

the BiOp — entitled Environmental Baseline — NMFS presents information on these fisheries

and the extent of takes occurring in them.  See SAR 13208-10.  NMFS includes a table that lists

estimated loggerhead takes for a number of fisheries that recently have undergone Section 7

consultations, including the specific fisheries that Oceana cites in its motion, which together

account for 610 takes, of which 257 are expected to be fatal.  See SAR 13210.  It is evident, then,

that NMFS was aware of and discussed those factors that Oceana has accused it of failing to

consider.  Indeed, Oceana does not point to any additional data that NMFS should have had in its

sights.  Rather, Oceana contends that in conducting its jeopardy analysis, NMFS did not actually

*consider* the information regarding cumulative effects and the impact of takes occurring in other

federally authorized fisheries.

   If NMFS had done nothing more than to list and describe data that it purported to

incorporate into its jeopardy analysis — without indicating how that data actually factors into the

analysis — the Court might well have found the BiOp deficient for such opacity.  See Tex Tin

Corp. v. U.S. EPA, 935 F.2d 1321, 1324 (D.C. Cir. 1991) (per curiam) (court "cannot defer to

agency expertise that was never explained").  But the BiOp offers more than this; when read as a

whole, the BiOp features sufficient explication of NMFS' reasoning in reaching its no-jeopardy

determination — as well as sufficient indication of its consideration of cumulative effects and the

impact of other fishery takes — to satisfy its burden under the Administrative Procedure Act.

   NMFS' no-jeopardy determination appears to be centered largely on its

identification of four population-level characteristics of the Northwest Atlantic Distinct

Population Segment of loggerheads:  a large nesting population; a nesting population that is

geographically widespread; a nesting population trend that recently has been in decline, but

which now appears to be stabilizing; and the fact that "substantial conservation efforts are

underway to address threats" to loggerheads' survival and recovery.  See SAR 13158, 13270.[13]

The BiOp cites a variety of data sources in support of its identification of these features.  With

respect to population size, the BiOp relies primarily on an estimate that places the adult female

population in the NWA DPS at about 30,500.  See SAR 13151, 13264.  NMFS also cites other

estimates, including a "much less robust" estimate of the total female population that ranges

---

[13]  These are the same factors relied upon by NMFS in its decision to list the NWA
DPS of loggerheads as threatened rather than endangered.  See SAR 13158.

from 60,000 to 700,000 individuals, SAR 13264, as well as a 2011 study drawing on aerial surveys of the Atlantic coast, which yielded a total population estimate of 588,000 loggerheads. SAR 13151.  Regarding nesting trends, NMFS states that "[w]hile several [earlier] documents reported [a] decline in nesting numbers in the NWA DPS, when nest counts through 2010 are analyzed, the nesting trends from 1989-2010 are not significantly different than zero."  SAR 13158.  In addition, "[t]he 2010 Florida index nesting number was the largest since 2000," and "[n]esting in the Northwest Atlantic in 2011 was on par with 2010, providing further evidence that the nesting trend may have stabilized."  SAR 13267.

The essential logic underlying NMFS' no-jeopardy determination is that, based on the current estimated size of the NWA DPS, its wide dispersion, the seemingly promising recent nesting trends, and the ongoing implementation of conservation measures, the species stands strong enough that the takes caused by the Scallop Fishery are not likely to jeopardize its continued existence.  See SAR 13270.  And NMFS reaches this conclusion while considering the Scallop Fishery takes "within the context of" the effects of those factors comprising the environmental baseline and included within cumulative effects.  See SAR 13263.  Although NMFS has not applied a specific quantitative formula to account for all of these factors, the agency's logic is both discernible and rational:  it weighed the impact of Scallop Fishery takes, as well as takes caused by other sources, against the four positive attributes that characterize the NWA DPS of loggerheads, and it concluded that the population's continued existence would not be jeopardized by these impacts.[14]  NMFS' conclusion, based on the agency's evaluation of data

---

[14]     In a related vein, the BiOp seems to indicate that the positive measures of loggerheads' population status — particularly population size and stabilizing nesting trends — reflect both cumulative effects and the impact of other fishery takes.  Cumulative effects are assumed to be consistent with prior trends and therefore incorporated into those measures.  SAR 13259-61.  With respect to takes occurring in other fisheries, the BiOp states that the impacts of those takes "are reflected in the status and trends of sea turtles" reported elsewhere in the BiOp.

within its realm of technical expertise, is entitled to substantial deference from this Court.  See

Communities for a Better Environment v. EPA, 748 F.3d at 336.

   In the few pages of briefing that it devotes to its arguments on this topic, Oceana

seems to focus entirely on NMFS' use of the Population Viability Analysis ("PVA").  See

Oceana MSJ at 30-31; Oceana Reply at 17-18.  The PVA is a technical paper relied upon by

NMFS in both the 2008 and 2012 BiOps, see SAR 13268-70, 13346-71, which "was used to

estimate quasi-extinction (the point at which so few animals remain that the species/population

will inevitably become extinct) likelihoods under conditions with and without fishery effects."

SAR 13269.  Its authors established a baseline population trajectory using the rate of change in

the adult female loggerhead population from 1989-2005.  SAR 13351.  The rate was then

adjusted by adding back the level of take attributable to the Scallop Fishery (converted to adult

female equivalents), and re-running the PVA.  SAR 13269.  The results of these two analyses

were compared, and the comparison showed that both the baseline and adjusted baseline (which

imagined a world with no Scallop Fishery takes) had quasi-extinction probabilities of zero at 25,

50, and 75 years, and a probability of 1% at 100 years.  Id.[15]

---

SAR 13208.  The implicit assumption, then, is that the level of loggerhead takes occurring in
other federally authorized fisheries is on par with the extent of takes that has been occurring in
recent years.  See id.  Although this point could have been established with better clarity — such
as through an explicit comparison of take numbers occurring in federally authorized fisheries
during the years from which NMFS draws its population trend data, as against those projected to
occur in the present and coming years — this lack of precision is not fatal to the BiOp.  See
Colorado River Cutthroat Trout v. Salazar, 898 F. Supp. 2d at 204-05 ("[A] court should 'uphold
a decision of less than ideal clarity if the agency's path may reasonably be discerned,' as it may
be here.") (quoting Building Industry Ass'n of Superior Cal. v. Babbitt, 979 F. Supp. 893, 898
(D.D.C. 1997)).

  [15] Oceana focuses on another finding produced by the PVA's model, namely that the
"median time to quasi-extinction" was predicted to be sooner (207 years versus 240 years) with
Fishery takes compared to a world without them.  See Oceana MSJ at 16; Oceana Reply at 9-10,
12, 14-15 & n.14, 18.  Oceana states that this finding shows that the Fishery will "hasten
Loggerheads' demise by 33 years."  Oceana Reply at 14 n.14.  In actuality, the median time to

According to Oceana, "[b]y adopting the PVA model from the 2008 BiOp, the 2012 BiOp . . . lumped together cumulative impact, the status of the species, and the environmental baseline to establish *a new baseline* against which the effects of the Fishery were analyzed."  Oceana MSJ at 30.  This approach, says Oceana, has the effect of isolating the Scallop Fishery's impacts from those of other sources of harm to loggerheads.  See id. at 30-31.  But a Section 7 consultation must determine whether the specific agency action under review actually causes some additional harm to the species, beyond that which the species may suffer due to other factors.  See Nat'l Wildlife Federation v. NMFS, 524 F.3d at 930.  The PVA singled out the Scallop Fishery to make such a determination, but this does not mean that the broader jeopardy analysis does not also account for the impact of cumulative effects and the takes occurring in other fisheries.  This is because the significance of the impact caused by Scallop Fishery takes will differ depending on the impacts caused by other factors, to which the Fishery's impact is added.  See id. ("[A]n agency may not take action that will tip a species from a state of precarious survival into a state of likely extinction.  Likewise, even where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm.").

Consequently, if baseline conditions are already dire, then even a small additional impact due to Scallop Fishery takes may require a jeopardy determination.  The PVA's methodology is not inconsistent with this framework.  Moreover, as NMFS emphasizes, the PVA

---

quasi-extinction refers to "[t]he time when the quasi-extinction probability is 0.50," SAR 13356 n.3, not to the time when quasi-extinction is predicted to occur.  In any event, interpretation of the PVA's various measures — and the relative weight to be given to each of these different measures — is a matter that falls within the purview of the expert agency, subject to review only for reasonableness.  Contrary to Oceana's view of the data, the PVA's authors considered the median times to quasi-extinction with and without Fishery effects to be "similar."  SAR 13357.  And NMFS discounted the value of this finding due to its long distance into an unknown future.  See SAR 13116.

does not constitute the entirety of its analysis; as explained above, the jeopardy determination rests in large part on the qualitative assessment of population indicators and the estimated extent of Scallop Fishery takes, considered in light of takes occurring in other fisheries as well as the impact of other sources of harm to loggerheads.  See NMFS Opp. & MSJ at 34.  The Court concludes that NMFS has sufficiently demonstrated its consideration of these factors.

## 2.  Climate Change

In comments submitted to NMFS pursuant to the Joint Stipulation and Order entered in Civil Action No. 07-0142, Oceana urged the agency to consider the effects of climate change in conducting its jeopardy analysis with respect to the NWA DPS of loggerheads.  The 2012 BiOp includes a separate section entitled *Climate Change*, SAR 13228-33, and the topic of climate change is discussed in other portions of the BiOp as well.  See SAR 13155-57.  Nonetheless, Oceana contends that NMFS has failed to actually consider the effects of climate change in reaching its jeopardy determination, and it maintains that this failure violates the agency's obligation to "use the best scientific and commercial data available" in formulating the BiOp.  16 U.S.C. § 1536(a)(2).[16]  In particular, Oceana argues that NMFS' choice to limit the scope of the action under review to only ten years, see SAR 13156, effectively "wrote out of the equation the effect of climate change on the status and recovery of the species."  Oceana MSJ at 40-41.  NMFS responds that it "did not limit its consideration of climate change to a ten-year period," as both its "narrative discussion on climate change and the PVA model consider long-term effects."  NMFS Opp. & MSJ at 41.

---

[16]    Oceana also complains that NMFS ignored other comments it had placed before the agency, concerning the implementation of "reasonable conservation efforts."  See Oceana MSJ at 19-20, 44; Oceana Reply at 28-29.  But it offers effectively no detail or argument to support these additional claims.  Accordingly, the Court will deny these claims for relief.

The Court concludes that NMFS sufficiently addressed the potential impacts of climate change in the 2012 BiOp.  In its discussion, NMFS reviews the current state of scientific data regarding climate change, and essentially determines that these data are too inconclusive to provide a basis for accurate predictions regarding impacts on loggerheads.  As the agency explains in the BiOp, "current scientific methods are not able to reliably predict the future magnitude of climate change, associated impacts, whether and to what extent some impacts will offset others, or the adaptive capacity of this species."  SAR 13156.  The agency does draw on existing studies to make some predictions about the types of factors that might affect loggerheads as a result of climate change — such as "increasing sand temperatures at nesting beaches which in turn would result in increased female:male sex ratio among hatchlings, sea level rise which could result in reduction in available nesting beach habitat, increased risk of nest inundation, and changes in the abundance and distribution of forage species which could result in changes in the foraging behavior and distribution of sea turtle species."  SAR 13231-32.  According to NMFS, however, the available science only enables it to offer these predictions at such a general, qualitative, and relatively speculative level.  See SAR 13231-33.  Due to the agency's stated inability to quantify these predicted impacts — a contention that Oceana fails to refute with citation to any overlooked scientific evidence — the Court finds that the agency's consideration of climate change impacts in the 2012 BiOp satisfies NMFS' burden to "use the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

Oceana cites cases in which courts have rejected an agency's contention that consideration of climate change was unwarranted because of the uncertain state of the available data, see Oceana MSJ at 42-43, but those cases — unlike this one — involved wholesale failures to even address the issue.  See Center for Biological Diversity v. Salazar, 804 F. Supp. 2d 987,

1008 (D. Ariz. 2011) ("The BiOp does not analyze or even mention climate change."); <u>South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.</u>, 723 F. Supp. 2d 1247, 1274 (E.D. Cal. 2010) ("The court cannot conclude that global warming's potential impacts are so slight that NMFS could ignore them without discussion."); <u>Pacific Coast Federation Fishermen's Ass'ns v. Gutierrez</u>, 606 F. Supp. 2d 1122, 1184 (E.D. Cal. 2008) ("The BiOp does not discuss this global climate change data or mention that NMFS, at a minimum, considered this data."); <u>Nat'l Resources Defense Council v. Kempthorne</u>, 506 F. Supp. 2d 322, 370 (E.D. Cal. 2007) ("FWS acted arbitrarily and capriciously by failing to address the issue of climate change in the BiOp. This absence of *any* discussion in the BiOp of how to deal with any climate change is a failure to analyze a potentially 'important aspect of the problem.'").  Here, by contrast, NMFS has offered qualitative predictions based on the available data, which it says it has considered in evaluating loggerheads' survival and recovery prospects.  Oceana does not explain how climate change-related data might have been more thoroughly evaluated with respect to the jeopardy analysis.

Another aspect of Oceana's climate change argument is its complaint that NMFS limits its definition of the scope of the action under review (that is, the continued operation of the Scallop Fishery) to a ten-year time frame.  It contends that "where the agency expects to see some effects of climate change on a 'century scale,' the decision to restrict the analysis to 10 years and assume no significant change during that period makes no sense."  Oceana MSJ at 44 (quoting SAR 13157).  But as the Court already has described, the agency adequately explained that due to the lack of precise data — including the lack of long-term data — NMFS cannot offer more than general predictions at this point regarding the potential impact of climate change on loggerheads.  Even though NMFS articulated its conclusion regarding climate change in the context of a ten-year time frame, Section 5 of the BiOp nonetheless discusses the long-term

impact of climate change, and the agency makes clear why it lacks the capability to quantify the

magnitude of climate change impacts on loggerheads in the long term.  Oceana also argues that

the ten-year scope of review regarding climate change is discordant with NMFS' reliance on the

PVA model's prediction of population trajectories out to 100 years.  See Oceana MSJ at 43.  But

there is no necessary discord in using the PVA's predictions at the 100-year mark to inform a

jeopardy analysis that, at least with respect to climate change, is expressed by reference to

predicted effects within the next ten years.  As already explained, the Court finds that the BiOp

provides sufficient discussion of the anticipated long-term effects of climate change, within the

constraints of available data.  The Court therefore concludes that NMFS adequately discharged

its obligation to consider climate change in the 2012 BiOp.

### D.  Incidental Take Statement

Finally, Oceana challenges the Incidental Take Statement issued as a part of the

2012 BiOp.  As explained supra at 4-5, an ITS is required where, as here, NMFS concludes that

agency action will not jeopardize a species' continued existence, yet will cause some takes

incidental to that action.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); Arizona Cattle Growers'

Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt., 273 F.3d 1229, 1241-42 (9th Cir. 2001).

The ITS sets forth the permissible "impact on the species" as expressed by the "incidental take"

of loggerheads in the NWA DPS.  See 16 U.S.C. § 1536(b)(4).  In the 2012 BiOp, NMFS

estimated that 161 loggerheads would be taken by dredge gear annually, with another 140 taken

by trawl gear each year.  In the ITS — located in Section 10 of the 2012 BiOp — those numbers

constitute limits on the number of loggerhead takes that can occur in the Fishery annually.  The

ITS thus provides a safe harbor that exempts the specified amount of incidental take from the

take prohibition set forth in Section 9 of the ESA.  See 16 U.S.C. § 1536(o)(2).  If the allowable

level of incidental take is exceeded, however, the agency is "required" to reinitiate Section 7 consultation "immediately."  50 C.F.R. §§ 402.14(i)(4), 402.16(a).  Oceana challenges the adequacy of the ITS with respect to both dredge and trawl fishing, and specifically maintains that due to inadequate monitoring of fishing activities in the Scallop Fishery, the take limits established in the ITS do not serve as meaningful triggers for the reinitiation of consultation. The Court addresses each of these challenges in turn.

1.  Dredge

A scallop dredge attaches behind a commercial fishing vehicle and essentially consists of a toothed bar on a frame with an attached bag on the backside of it.  Dredges vary in size, with a "standard 15-dredge frame weigh[ing] approximately 4,500 pounds."  SAR 13235. As the frame drags along near to the sea bottom, the toothed bar dislodges scallops that then collect in the bag.  SAR 13234.  The dredge bag is made of "metal rings with twine mesh on the top and, sometimes, chafing gear on the bottom."  Id.  The ITS anticipates "the annual average take of up to 161 [loggerheads] in dredge gear, of which up to 129 per year may be lethal in 2012 and up to 46 per year may be lethal in 2013 and beyond."  SAR 13295.

To determine whether this incidental take limit of 161 turtles annually has been exceeded, NMFS states that it will employ a "combination" of two monitoring approaches:  a "dredge hour surrogate as a measure of actual takes," and "the methods to estimate sea turtle/dredge interactions as described in [a 2011 scientific paper authored by Kimberly T. Murray]."  SAR 13302.  Both of these methods are aimed at addressing the inadequacy of "observer coverage" as a means of monitoring loggerhead takes.  Traditionally, NMFS-trained observers have accompanied fishing vessels on some of their outings, and these observers record loggerhead takes when they occur.  See SAR 13301.  Since implementing gear modifications to

mitigate harm to loggerheads interacting with dredge gear, however, many loggerhead takes are now unobservable, as the turtles are deflected away from the dredge and therefore are not captured in the dredge bag and hauled up onto the vessel.[17]

The two major modifications to dredge gear are (1) Turtle Deflector Dredges ("TDDs") and (2) chain mats.  A TDD is "designed to deflect sea turtles over the dredge rather than underneath it," because "keeping sea turtles from going underneath the dredge and keeping them out of the dredge bag is expected to reduce the severity of some interactions that occur." SAR 13252; see also SAR 13132.  Chain mats provide a similar benefit by "act[ing] as a barrier to prevent the capture of [sea turtles] in the ring of the bag."  SAR 13235.  While the "gear modifications are not expected to reduce the actual number of sea turtle interactions with scallop dredge gear," SAR 13134, "the severity of sea turtle injuries as a result of scallop dredge interactions will be less if the turtle is interacting with a TDD or dredge equipped with chain mats as compared to a standard dredge."  SAR 13249; see also SAR 13252.  Both modifications are required throughout the majority of the Fishery during the months when loggerhead presence peaks.  See SAR 13132 (TDDs); SAR 13235 (chain mats).

Although these technologies are meant to benefit loggerheads, they make the observation of loggerhead takes more difficult.  As a consequence, NMFS plans to rely primarily on a monitoring "surrogate" to measure when the numerical take limit of 161 turtles has been reached.[18]  The surrogate chosen by NMFS is the "dredge hour" — that is, the number of hours spent dredge fishing.  NMFS will consider the ITS "exceeded," thus re-triggering consultation, if

---

[17]    Of course, even when a turtle is merely deflected away from a dredge, the interaction with the dredge gear still constitutes a "take" under the ESA.  See 16 U.S.C. § 1532(19).

[18]    For the limited dredging that occurs without the use of TDDs or chain mats, the Fishery will continue to rely on observer coverage.  SAR 13301.

the "two-year running average of dredge hours in Mid-Atlantic waters . . . during the period of

May through November of any scallop fishing year is greater than the average of the total

number of dredge hours from Mid-Atlantic waters . . . during the same period of 2007 and

2008." SAR 13302. The two-year running average for 2007-2008 was 252,323 hours. SAR

11599. The calculation and comparison of the two-year running averages will be performed on

an annual basis. SAR 13297.

Oceana challenges two aspects of the ITS with respect to dredge fishing, arguing

that (1) NMFS' use of a surrogate for monitoring incidental takes is arbitrary and capricious

because there are viable options for direct monitoring of these takes; and that (2) even if

employing a surrogate is not unlawful, NMFS' choice of the dredge hour surrogate in particular

is arbitrary and capricious, because the method fails to serve as a meaningful trigger for

reconsultation. Oceana MSJ at 33-36; Oceana Reply at 18-26.

The Court first addresses whether NMFS' decision to use a surrogate — rather

than to directly monitor loggerhead takes — is arbitrary and capricious. Oceana maintains that

two alternative methods could feasibly be employed to monitor takes, despite the observation

difficulties caused by the implementation of TDDs and chain mats. Oceana argues that NMFS

could rely upon either underwater video monitoring, or the estimation methodologies set forth in

the 2011 paper authored by Murray. Oceana MSJ at 34-35.[19] According to Oceana, NMFS

failed to explain why the dredge hour surrogate was necessary in light of these methods, which,

according to Oceana, are available and superior to any surrogate.

---

[19]     As the Court noted supra at 37, NMFS claims to use the dredge hour surrogate in
combination with the estimation method developed in the Murray (2011) paper. But the ITS
seems to indicate that any plans to employ the so-called "Murray framework" on an ongoing
basis are merely speculative. See SAR 13302. Accordingly, the Court focuses on NMFS'
reliance on the dredge hour surrogate as its mechanism for monitoring loggerhead takes
attributable to dredge gear.

The Court disagrees with Oceana.  NMFS explained that the Fishery's gear modifications obscure observers' ability to count actual takes, making observer coverage "less effective."  SAR 13301.  In light of this obscurity, NMFS considered alternatives for monitoring takes, including underwater video monitoring and removing chain mats from some hauls.  Id. With respect to underwater video monitoring, NMFS determined, "[b]ased on the information currently available as well as the hardships experienced during previous use of this technology in studies of sea turtle interactions with scallop dredge gear," that its use for monitoring "remains infeasible."  Id.  Likewise, NMFS concluded that because "removal of the [chain mats] will likely increase the number of serious injuries and mortalities of sea turtles," using this method to bolster observer coverage is not reasonable.  Id.  NMFS also considered using the Murray (2011) framework on its own — rather than in combination with the dredge hour surrogate — to numerically estimate takes, but reasonably (albeit briefly) explained that the approach has "a number of caveats," particularly given certain limitations on the availability of data needed by the model.  See SAR 13302.

Oceana contends that NMFS' rejection of the video monitoring option "is not based on current or complete information regarding the practicality of underwater camera use." Oceana MSJ at 34.  Oceana points out that NMFS appears to have based its decision on the authority of a single intra-agency memorandum issued in 2007, which, Oceana says, is both unreliable and outdated.  See id.  And Oceana cites parts of the record indicating that researchers have actually performed studies employing video monitoring on dredge gear, and that NMFS has relied on these studies to inform some of its decision making.  See id. at 34-35; see also id. at 35 n.23 (citing studies in the record involving the use of video monitoring on scallop dredges, and citing YouTube videos taken by cameras mounted on dredges).  The fact that video monitoring

has been used in some scientific studies, however, does not refute NMFS' assessment that it is not feasible to use underwater video as the method for monitoring dredge interactions in the Fishery.  As stated in the 2007 memorandum cited in the BiOp, the use of video in various studies has been conducted not under normal fishing conditions, but under preferable weather, sea state, and lighting conditions.  See AR 87-88.  Oceana asserts, however, that advances in technology since 2007 render NMFS' rationale for rejecting video monitoring outdated.  See Oceana MSJ at 34-35; Oceana Reply at 24 ("Current capabilities of underwater cameras were not discussed in the ITS, and it is beyond dispute that technology has dramatically advanced since then.").  But Oceana does not back up this contention with support specific to the question at hand:  whether video monitoring could feasibly serve as the primary means of monitoring dredge takes.  Moreover, the Court will defer to an agency's judgment on a technical matter such as this one, provided that the agency has explained its reasoning.  See Communities for a Better Environment v. EPA, 748 F.3d at 336.  Here, NMFS has shown that it considered the option of employing underwater video monitoring, yet reasonably rejected its feasibility.  The Court will not upset NMFS' decision on this point.

Nor is the Court persuaded that NMFS' rejection of the Murray estimation framework was arbitrary and capricious.  Oceana's brief argument on this point does not demonstrate that this method by itself feasibly could be used to monitor dredge takes on an ongoing basis.  See Oceana MSJ at 35-36.  The agency considered this option and decided against employing it as its primary means of monitoring loggerhead takes in the dredge fishery, and the Court defers to this judgment.

In sum, the Court concludes that NMFS' decision to monitor dredge takes by way of a surrogate is not arbitrary or capricious.  What remains, then, is Oceana's challenge to the

particular monitoring surrogate chosen by NMFS:  the number of hours spent dredge fishing in Mid-Atlantic waters from May through November.  Oceana maintains that the dredge hour surrogate fails to function in a manner that will gives effect to the ITS' dredge take limit of 161 loggerheads.  See Oceana MSJ at 36-38; Oceana Reply at 24-26.

The provision of a monitoring mechanism in an ITS enables the take limit to operate as "a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation." Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt., 273 F.3d at 1249; see also Wild Fish Conservancy v. Salazar, 628 F.3d at 532 ("[A] numerical cap is useful only insofar as the action agency is capable of quantifying take to determine when the trigger has been met.").  According to NMFS, the theory behind the dredge hour monitoring surrogate is simple — the more hours spent dredge fishing, the more turtles will interact with dredge gear. See SAR 13296, 13299.  NMFS contends that by counting dredge hours and comparing them, on an annual basis, against the average number of dredge hours fished in 2007 and 2008, the agency has implemented a monitoring system capable of functioning as a trigger to determine when the dredge take limit of 161 turtles has been exceeded.  See SAR 13302.  And as already noted, if the allowable level of incidental take is exceeded, NMFS is "required" to reinitiate Section 7 consultation "immediately."  50 C.F.R. §§ 402.14(i)(4), 402.16(a).

But the Incidental Take Statement here simply fails to explain how 252,323 dredge hours equals 161 takes.  Instead, NMFS explains that it chose this particular number of dredge hours because 2007 and 2008 "are the first two years after chain mats were required and the last two years included in the Murray [2011] analysis," from which NMFS drew its estimate of 161 dredge gear takes.  SAR 13302; see also SAR 13245 (describing the Murray study in

further detail).  As Oceana points out, however, recording the fact that an hour of dredge fishing

has taken place is not automatically equivalent to observing the occurrence or non-occurrence of

a specific number of loggerhead takes.  In actuality, any number of takes might occur during a

given time period spent dredge fishing.  See Oceana MSJ at 38 n.24.  A surrogate is only as

useful as its fit with the actual object of study for which the surrogate is substituting.  See Wild

Fish Conservancy v. Salazar, 628 F.3d at 531 ("If a surrogate is used, the agency must articulate

a rational connection between the surrogate and the taking of the species.").  The Court

concludes that the 2012 BiOp fails to sufficiently explain how the specific number of dredge

hours that NMFS has chosen as a monitoring surrogate adequately serves as a proxy for the

numerical take limit of 161 loggerheads.  As a consequence, the Court will remand the ITS to

NMFS so that it can either more clearly explain the connection, or, if unable to do so, so that it

can choose a number of hours that does align with the numerical take limit.  In doing so, the

agency must address Oceana's valid concern regarding the effectiveness of linking an hour-based

surrogate to a numerical take limit, in the context of a Fishery where conditions change on a

continuous basis.[20]

### 2.  Trawl

Somewhat similar to a dredge, trawl gear consists of a wide-mouthed net that

drags behind a vessel.  While the trawl component of the Fishery consists of only eleven vessels,

SAR 13131, the ITS still estimates "the annual average take of up to 140 individuals in trawl

gear, of which up to 66 per year may be lethal."  SAR 13295.  To monitor this take limit, NMFS

---

[20]        Although the Court finds insufficient NMFS' explanation regarding how its
surrogate, as set forth in the BiOp, can function as a trigger with respect to the dredge take limit,
the Court rejects Oceana's broader argument that the use of dredge hours as a surrogate for
loggerhead takes necessarily is arbitrary and capricious because it is "co-extensive with the
scope of the Fishery's dredge operation."  See Oceana MSJ at 37-38; see also Oceana Reply at
23-25.

will "continue to use observer coverage as the primary means of collecting incidental take information." SAR 13302. This is because, "[u]nlike for dredges, chain mats are not required on trawl gear. Therefore if a turtle were unable to avoid an oncoming trawl, it would likely be captured in the trawl and, when the gear was hauled to the vessel, an observer could spot and record the incidental take." NMFS Opp. & MSJ at 39-40. The agency explains that it created the numerical take limit of 140 turtles "using a statistical estimate that is not feasible to conduct on an annual basis . . . due to the data needs; length of time to develop, review, and finalize the estimates; and methodology used." SAR 13303. Consequently, NMFS proposes re-estimating takes by trawl gear "approximately every five years." Id. Although not explicitly stated in the BiOp, NMFS presumably will compare this re-estimate against the 140 turtle take limit to determine whether that limit has been exceeded during each of the five years preceding calculation of the estimate.

Oceana contends that re-estimating trawl takes on a five-year schedule rather than more frequently renders the monitoring mechanism ineffective. See Oceana MSJ at 38-39; Oceana Reply at 21. Oceana emphasizes that NMFS' track record over the past decade indicates that new BiOps are issued much more frequently than every five years, and therefore it is unlikely that the take limit actually will be monitored "during the life of the BiOp." Oceana Reply at 21; see also Oceana MSJ at 39 ("The trawl-gear component of the Fishery can expect to operate with impunity because it is unlikely that any measure of its compliance would be taken before a new BiOp issues . . . ."). Oceana "believes that such estimation could reasonably be done on a monthly basis utilizing monthly observer reports, but should be done at least on an annual basis to ensure that the limit has not been exceeded." Oceana Reply at 21 n.21. Oceana does not, however, support this belief with citation to any evidence or authority. Nor does it

request the placement of more observers on trawl vessels, and the parties' briefing does not address whether such a solution would be feasible.

The Court shares Oceana's concerns regarding the effectiveness of a monitoring mechanism that is only able to assess every five years whether an *annual* take limit has been exceeded.  NMFS is required under its own regulations to reinitiate Section 7 consultation "immediately" if "during the course of the action the amount or extent of incidental taking . . . is exceeded."  50 C.F.R. § 402.14(i)(4); see also id. § 402.16(a).  Thus, as Oceana argues, "there may be no recourse even if the scallop trawl take exceeds the estimate for five straight years."  Oceana Reply at 21.  Nonetheless, the Court is unwilling to conclude at this point that NMFS' trawl take monitoring mechanism necessarily is arbitrary and capricious for this reason.  The agency's primary explanation for the five-year estimation period — a lack of data — may result from constraints over which NMFS has little to no control.  In particular, the BiOp suggests that the lack of data results from a dearth of observer coverage, see SAR 13135, 13231, 13238, a point also made in the agency's briefing, NMFS Opp. & MSJ at 39-40, and reiterated by counsel for NMFS at oral argument.  The five-year timetable may reflect very real limitations on NMFS' data collection capabilities; consequently, it is possible that NMFS' monitoring system for trawl takes represents the best available option for measuring trawl takes in the Fishery.

But the BiOp's terse treatment of trawl take monitoring makes it difficult for the Court to discern NMFS' rationale in this regard.  As noted, the long gap in measuring trawl takes stands in marked tension with the regulatory requirement that NMFS reinitiate Section 7 consultation "immediately" if "during the course of the action the amount or extent of incidental taking . . . is exceeded."  50 C.F.R. § 402.14(i)(4).  The single paragraph that NMFS devotes in the BiOp to explaining its monitoring choice is insufficient to allay this concern.  Nor does the

paragraph addressing trawl take monitoring discuss in any detail the nature of NMFS' statistical model and its data needs.  NMFS also fails to address whether any monitoring alternatives exist that might be operable on a shorter timetable.  Given these serious uncertainties about the effectiveness of the five-year monitoring framework, the Court must remand to the agency so that it can either provide a more thorough explanation of its choice, or, if unable to do so, reach a different conclusion.  Cf. Delta Air Lines, Inc. v. Export-Import Bank, 718 F.3d 974, 978 (D.C. Cir. 2013).[21]

## V.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part each party's motion for summary judgment and it will remand this matter to NMFS for the limited purpose of addressing the deficiencies in the Incidental Take Statement, as identified in this Opinion.  The Court also directs the parties to meet and confer regarding an appropriate schedule for NMFS to follow in its revision of the ITS.

The Court rejects Oceana's argument that the BiOp should be vacated.  Vacatur of the BiOp or even just of the ITS would not be an appropriate remedy in this case.  "The appropriateness of vacating an inadequately explained agency action depends on whether (1) the agency's decision is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly."  Northern Air Cargo v. U.S. Postal Serv., 674 F.3d 852, 860-61 (D.C. Cir. 2012).  As the Court's analysis of the ITS indicates, NMFS may be able to justify its choices regarding the monitoring of dredge

---

[21]     In its briefing and at oral argument, NMFS suggested that monthly reporting by observers on trawl vessels may provide a mechanism for more timely monitoring, see NMFS Opp. & MSJ at 40, but the BiOp itself does not explain how this reporting system might play any role in serving as the mechanism for determining when the take limit has been exceeded.  Nor is it clear to the Court how periodic reporting could lead to a finding that the trawl take limit has been exceeded, given NMFS' description of the paucity of its sample size.  See id.

and trawl takes through more thorough and informative explanation.  Moreover, because the

Court has concluded that the BiOp's no-jeopardy determination and its associated take limits are

not arbitrary and capricious, the Scallop Fishery will continue to operate under these limits.  This

means that NMFS must continue to use its existing monitoring tools in the interim even while it

revises the ITS.  An appropriate Order accompanies this Opinion.

      SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  December 17, 2014